UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JEFFREY ISAACS, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 1:17-cv-11221-FDS |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

**INTRODUCTION**

1. In 2014, Plaintiff, Jeffrey Isaacs, M.D. ("Dr. Isaacs"), sought an investigation into activities surrounding his short-lived experience as a resident at the Dartmouth Hitchcock Medical Center ("Dartmouth Hitchcock"). Dr. Isaacs traveled a long road to his residency at Dartmouth Hitchcock, having endured difficult circumstances before successfully completing his medical education at the American University of the Caribbean and receiving a score in the top decile on the difficult Part 1 of the United States Medical Licensure Examination.

2. Unfortunately, Dr. Isaacs' experience at Dartmouth Hitchcock involved supervisor harassment and abusive treatment, all stemming, upon information and belief, at least partially from a retaliation claim made against the Keck School of Medicine of the University of Southern California ("Keck") relating to a head injury originally suffered as an undergraduate student at Dartmouth College. This injury contributed to the causes of an alleged professional conduct incident that Keck ultimately used to expel Dr. Isaacs. Dr. Isaacs settled the matter

following litigation, and, as an integral part of the settlement agreement, the related papers were sealed.

3. Nevertheless, Dartmouth Hitchcock apparently learned of the circumstances of Dr. Isaacs' experience at Keck despite the papers being sealed. Setting aside any impropriety that may have occurred to obtain such access, Dartmouth Hitchcock officials and supervising physicians reacted with a pattern of mistreatment and abuse of Dr. Isaacs from the first day of his residency. This treatment included meritless (and later withdrawn) allegations that Dr. Isaacs lacked appropriate medical training, directions to perform repeated uncomfortable and unnecessary tests, and a failure to acknowledge or take seriously physical conditions arising out of his fragile and impaired health. Dartmouth Hitchcock ultimately terminated Dr. Isaacs without adequate cause or due process.

4. Dr. Isaacs eventually filed legal actions against Dartmouth Hitchock and Dartmouth, representing himself at significant cost. He learned of additional facts through these lawsuits, including that his computer files and medical records had been destroyed.

5. Dr. Isaacs also requested that the United States Department of Education, Office of Civil Rights ("OCR"), investigate the circumstances of his residency and termination at Dartmouth Hitchcock. On April 19, 2014, Dr. Isaacs submitted a request for investigation to OCR's Boston, Massachusetts office, describing his treatment at Dartmouth Hitchcock as well as the court cases he had filed seeking relief from his treatment and termination. OCR denied this request on October 17, 2014, based upon a purported failure to submit the complaint within the applicable limitations period. Dr. Isaacs filed an appeal of this determination on November 5, 2014, with additional support being offered on December 12, 2014.

6.  As of June 30, 2017, OCR had not acted upon Dr. Isaacs' appeal. On that date, Dr. Isaacs filed a complaint pursuant to the Administrative Procedure Act based upon the unreasonable delay in OCR's decision on his appeal. In response to this complaint, on August 14, 2017, OCR issued a short and formulaic denial of Dr. Isaacs' appeal. The denial letter contained no substantive response to, or analysis of, the meritorious arguments contained in Dr. Isaacs' appeal.

7.  Relatedly, in March 2015, Dr. Isaacs submitted to DOE a Loan Discharge Application relating to his loans for medical school. The bases for this application included Dr. Isaacs' mental condition arising from a head injury sustained in 1997 that had lasting effects and an alleged disciplinary incident that occurred while Dr. Isaacs attended the Keck School of Medicine at the University of Southern California. Both of these circumstances predated Dr. Isaacs' Federal loan relating to his medical school attendance at the American University of the Caribbean, and both potentially rendered him unable to meet the legal requirements for employment as a physician.

8.  In a letter dated June 3, 2015, MOHELA, the relevant DOE loan servicer, informed Dr. Isaacs that the DOE denied the discharge request. This letter contained no substantive assessment of Dr. Isaacs' application nor any factual or legal analysis whatsoever.

9.  Dr. Isaacs appealed this denial in a letter dated June 22, 2015. In this appeal, Dr. Isaacs' expanded upon his explanation in the original application regarding the reasons for his mental condition and the allegations rendering him unable to obtain a medical license, including that he had applied to "nearly every hospital in the country for residency training," only to be met with denials.

10. DOE issued a denial of this appeal on March 16, 2016. This denial claimed that, based upon the facts presented, Dr. Isaacs would have found it "difficult, but not impossible" to obtain a license.

11. Both of these decisions were arbitrary and capricious, and neither was supported by the facts that DOE relied upon in its decision. In fact, the decisions are internally inconsistent. Either there was a problem with Dartmouth's and the New Hampshire Medical Board's actions, warranting the investigation that Dr. Isaacs sought, or both entities acted properly, demonstrating it was indeed legally and otherwise impossible for Dr. Isaacs to obtain a license. DOE should be required to investigate or discharge Dr. Isaacs' loan debt. It is arbitrary and capricious to do neither.

## JURISDICTION AND VENUE

12. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (Federal question jurisdiction), and 5 U.S.C. § 702, (the Administrative Procedure Act).

13. Venue is appropriate pursuant to 28 U.S.C. § 1391(e) because, at the very least, a substantial part of the events and omissions giving rise to this action occurred in this district.

## PARTIES

14. Plaintiff Dr. Isaacs is located at 3553 West Chester Pike, Unit 177, Newtown Square, Pennsylvania 19073. Dr. Isaacs holds a Bachelor of Arts degree from Dartmouth College and a Masters in Business Administration from the Wharton School/Insead. Dr. Isaacs obtained a Doctor of Medicine degree from the American University of the Caribbean in 2010. Dr. Isaacs began a residency at Hitchcock in June 2011, and his superiors terminated him from the residency in March 2012.

15. The United States Department of Education is an agency of the United States. The relevant office relating to Dr. Isaacs' request for investigation within the Department of Education, the OCR, is located at 5 Post Office Square, 8th Floor, Boston, Massachusetts 02109-3921. OCR's mission is to "ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights." https://www2.ed.gov/about/offices/list/ocr/aboutocr.html

16. The relevant U.S. Department of Education office for the Federal loan discharge appeal is the Office of Federal Student Aid. The location of the branch of this Office that denied Dr. Isaacs' appeal is at 50 Beales Street, Suite 8600, San Francisco, California 94105.

17. The Higher Education Loan Authority of the State of Missouri, also known as "MOHELA," is a Department of Education loan servicer. On its website, MOHELA pledges to provide the tools to assist loan holders successfully repay their student loans. https://www.mohela.com/DL/common/about.aspx. MOHELA is located at 633 Spirit Drive, Chesterfield, Missouri 63005.

## FACTUAL BACKGROUND

18. In 1997, as an undergraduate student at Dartmouth College, Dr. Isaacs suffered a head injury from an incident with an intoxicated student. The head injury lingered and caused what was then described as post-concussion syndrome. Shortly after it occurred, the head injury severely affected Dr. Isaacs' ability to pursue his pre-med curriculum. He dropped the most difficult of his classes and focused instead on less rigorous schoolwork. Dr. Isaacs ultimately obtained his degree, in computer science, without delay, as he had completed most of the CS requirements prior to the head injury.

19. Over the following several years, Dr. Isaacs, among other activities, obtained a Masters in Business Administration. He also, over time, completed the pre-med curriculum requirements that he had not finished at Dartmouth College.

20. Dr. Isaacs enrolled in Keck in August 2005. An unfortunate series of circumstances occurred during his first year there that ultimately led to his leaving that school. These circumstances were characterized by Keck as "professionalism," rather than academic deficiencies, in light of an allegation made by one of Dr. Isaacs's Keck classmates. Dr. Isaacs informed the Keck Dean that the "unprofessional" behavior in all likelihood was irritability and/or hypomania which stemmed from an adverse reaction to a medication he had re-started for post-concussive syndrome. The Dean chose to ignore Isaacs's disability concern; Isaacs believed that this omission was due to the Dean having received $30 million in National Institutes of Health grant funding from the complaining classmate's father, a National Institute of Health Director.

21. Litigation ensued, and two court settlements eventually addressed the incidents that occurred at Keck. The first settlement, which occurred in September 2007, sealed certain Keck records relating to Dr. Isaacs. This confidentiality was the full consideration obtained by Dr. Isaacs in the settlement. The second settlement, in 2008, "discharge[d] all contracts and agreements" relating to Dr. Isaacs' time at Keck, including his enrollment there.

22. In the meantime, Dr. Isaacs enrolled in the school of medicine at the American University of the Caribbean and received his Medical Doctor degree in 2010. Dr. Isaacs applied for and received Federal student aid in an amount greater than $200,000 to pay for school tuition. Dr. Isaacs was highly successful at this institution, receiving honors from most of his competitive clinical medical student rotations, which included the Cleveland Clinic and Mount Sanai School

of Medicine. His score on the United States Medical Licensing Examination exceeded that of the average neurosurgeon, his desired specialty.

23. Later in 2010, Dr. Isaacs began a surgical program residency at the University of Arizona ("Arizona"). Unfortunately, by his third day at Arizona, he was described as being "far behind his peers" and lacking "technical ability." Dr. Isaacs experienced difficulties understanding these criticisms, as he had perfectly completed the only procedure, a sub-cuticular suture, that he had been required to perform. Dr. Isaacs voluntarily resigned at Arizona after he had worked there for approximately six weeks.

24. Dr. Isaacs subsequently applied for a residency at Dartmouth Hitchcock, and that institution offered him a psychiatric residency position in March 2011. The portion of Dr. Isaacs's New Hire Packet that he was required to complete contained multiple references to his tenure at Arizona. He began at Dartmouth Hitchcock in July 2011.

25. From the first days of his residency, Dr. Isaacs was subject to mistreatment and abuse. Superiors and attending physicians criticized his every move and described him as having "incapacitating anxiety." Dr. Isaacs spent much of his first week on an internal medicine rotation, and, during this time, his superior ordered him to perform two unnecessary prostate examinations, one of which was on a 90-year old individual with terminal cancer. This direction appeared to be part of a pattern of treating Dr. Isaacs differently from other residents; Dartmouth has never officially responded to, or investigated, this allegation. Upon information and belief, this inequitable treatment was related, at least in part, to Dartmouth's knowledge of the circumstances of his departure from Keck.

26. Dr. Isaacs received predominantly positive reviews of his performance during the the vast majority of residency time he spent in psychiatry rotations. Nevertheless, the stress of

being placed on probation soon after starting at Dartmouth Hitchcock and suffering criticism from superiors and attending doctors led to the development of significant health problems. Despite previously functioning effectively through 30-hour rotations, Dr. Isaacs became unable to stay awake for more than three hours at a time. Implicitly recognizing this significant condition, the Dartmouth Hitchcock psychiatry department attempted to evaluate his condition during his residency through testing, ultimately to no avail.

27. Dr. Isaacs requested accommodations for his severe sleep disorder during his residency, including on several occasions requesting a finite period of medical leave in order to recuperate and further evaluate his condition. His superiors repeatedly denied these requests.

28. Dr. Isaacs' sleep condition constituted a "physical . . . impairment which substantially limit[ed] one or more major life activities," as those terms are described in the regulations implementing Section 504 of the Rehabilitation Act of 1973. 34 C.F.R. § 104.3(j)(1). This law is designed to preclude discrimination based on handicaps in federally funded programs. Dr. Isaacs's requests for medical leave fell within the guidelines describing "reasonable accommodations" under Section 504-related regulations. *See* 34 C.F.R. § 104.12.

29. The sleep disorder was in addition, and likely related to, a longer term medical condition related to head injury suffered as an undergraduate student in 1997. Neurological testing in 2012 revealed that Dr. Isaacs experienced significant frontal brain impairment. While one doctor attributed the impairment to Asperger's, a second doctor connected the frontal brain impairment condition with post-concussion syndrome arising out of the 1997 head injury.

30. Dr. Isaacs' residency began to reach its end in January 2012, when his superior accused him of concealing his time at Arizona from Dartmouth Hitchcock. This accusation occurred despite the Arizona disclosure in Dr. Isaacs' new hire submission. This unfounded

accusation, combined with everything that had already transpired, drove Dr. Isaacs to the Emergency Room with a psychological crisis. Dr. Isaacs later discovered that within days of this event, Dartmouth Hitchcock deleted both his email account and the test results relating to the evaluation of his sleep condition.

31.   On March 19, 2012, Dartmouth Hitchcock issued a termination letter to Dr. Isaacs. The letter purportedly based his termination on the failure to disclose his time as a medical student at Keck (which Dr. Isaacs believed had been annulled in the settlement) on his residency application, and on the false allegation that he had not included his tenure at Arizona on that application. The termination occurred without any of the administrative procedures established by Dartmouth policies. Specifically, Dr. Isaacs was terminated without any probation or fair hearing, termination elements required by Dartmouth Hitchcock bylaws.

32.   Dr. Isaacs repeatedly attempted to have Dartmouth investigate his claims. Beginning in 2012, his attempts were met with obfuscations and denials, seemingly each time based upon a different purported justification. Marc Bertrand, GME Dean, promised Dr. Isaacs a hearing in 2013 that was rescheduled several times, until Attorney Edward Kaplan withdrew that offer in 2014. Dartmouth administrators and counsel continued to deny Dr. Isaacs' reasonable requests for an investigation into 2014.

33.   Dr. Isaacs also brought litigation, *pro se*, to reach the bottom of his treatment and dismissal at Dartmouth Hitchcock. He originally filed an action in a District Court for the District of New Hampshire in February 2012 and later brought an action in the Eastern District of Pennsylvania. The New Hampshire Court granted summary judgment against him on April 18, 2014, and the Pennsylvania action containing new and additional claims was dismissed for lack of jurisdiction. During discovery in the New Hampshire action, deposition testimony

revealed that no investigation of his claims never occurred. Yet no reason for this failure became clear.

### Dr. Isaacs' Complaint And Appeal To OCR

34.     On April 19, 2014, Dr. Isaacs sent a complaint in an electronic mail message to OCR. *See* Exhibit A, attached. In this email, Dr. Isaacs described the disability he suffered in the time period leading up to January 2012, as well as the head injury for which he had previously filed an Americans With Disabilities Act claim. Dr. Isaacs further described the treatment he suffered at the hands of his supervisors beginning in June 2011 during his residency at Dartmouth-Hitchcock. He explained that he was, at the time, bedridden and unable to stay awake for more than three hours at a time, a condition that began during his ill-fated residency. Dr. Isaacs' email concluded by requesting that OCR investigate his complaint, and he offered to provide any other information that OCR might require.

35.     On or about October 16, 2017, Jane Lopez, OCR Team Leader/Civil Rights Attorney attempted to contact Dr. Isaacs by telephone about his complaint but reached his father. That same day, Ms. Lopez sent Dr. Isaacs an email to set up a telephone conference about Dr. Isaacs' complaint. The telephone conference occurred during the afternoon of October 17, 2014. During the call, Dr. Isaacs described the circumstances of his situation in greater detail, and Ms. Lopez stated that her office previously had experienced difficulties with complaints against Dartmouth. For example, Ms. Lopez explained that her office had received complaints against Dartmouth years after the relevant occurrences, and that she had knowledge of other individuals being ostracized by Dartmouth. Dr. Isaacs and Ms. Lopez also noted that the Department of Education was investigating Dartmouth relating to its responses to OCR-related complaints.

36. In a letter dated that same day, October 17, 2014, OCR informed Dr. Isaacs that it was "closing" his complaint. *See* Exhibit B. This letter, authored by Anthony Cruthird, a Team Leader/Civil Rights Attorney, explained that OCR evaluated the complaint pursuant to its authority relating to the prohibition of discrimination based on disability as well as the prohibition of discrimination on the basis of sex. After repeating Dr. Isaacs' allegations, OCR concluded that the allegations were untimely because the "alleged discriminatory conduct occurred in 2011 and 2012." Mr. Cruthird explained that OCR does not investigate allegations that are filed more than 180 days after the date of the alleged discrimination.

37. Mr. Cruthird then assessed whether Dr. Isaacs qualified for a waiver of the 180 day period, specifically considering whether Dr. Isaacs was sufficiently incapacitated to qualify for a waiver. The OCR letter concluded that he was not, because Dr. Isaacs had made various efforts to address his circumstances, including contact with police and Dartmouth officials and Dr. Isaacs' litigation efforts. Responding to Dr. Isaacs' statement that the complaint was timely because he was unaware of Dartmouth's obligation to investigate his complaint until late 2013, Mr. Cruthird stated that Dr. Isaacs was aware of the underlying conduct and an obligation to respond as early as early 2012.

38. After informing Dr. Isaacs that OCR was dismissing his complaint, the letter indicated that any questions should be directed to Attorney Jane Lopez. Dr. Isaacs sent an email to Ms. Lopez on November 5, 2014, in response to the October 17 letter. In the email, Dr. Isaacs explained that he was prepared to file an appeal. He further corrected one statement about the relevant facts from the OCR letter, then focused on the issue of waivers of the 180-time period on which OCR relied to dismiss the complaint. Dr. Isaacs asserted that waiver (c) should have applied because he filed his complaint with OCR before the courts reached decisions in the two

cases he pursued. Indeed, portions of his claims that were pending in Pennsylvania at the time OCR dismissed the case have never been adjudicated. He further stated that (d) also applied because he only learned in early 2014 that Dartmouth never initiated an internal grievance investigation, after informing Dr. Isaacs that one would occur.

39.  On November 12, 2014, Ms. Lopez informed Dr. Isaacs that she would process his November 5 email as an appeal and that any additional information or documents Dr. Isaacs wished to file in support of his appeal were due on December 16, 2014. *See* Exhibit C.

40.  Dr. Isaacs submitted a letter to OCR on December 12, 2014, providing further information and documents in support of his appeal. *See* Exhibit D. In this letter, Dr. Isaacs explained that Dartmouth refused to investigate his Title IX claims over a period of time ending in early 2014, typically in response to Dr. Isaacs's inquiries and using different justifications on each occasion. At one point in early 2013, Dr. Isaacs was told by Dean Bertrand that an investigation would commence, but he ultimately learned that would not occur. Dr. Isaacs' letter then cited statements in depositions by Dartmouth administration officials denying that any investigation occurred. Although this letter focused on Title IX claims, it applies with equal force to Dr. Isaacs' claims based on his handicap(s).

41.  Because OCR had not provided Dr. Isaacs a decision on his appeal, Dr. Isaacs filed a complaint on June 30, 2017, alleging that the agency unlawfully withheld or unreasonably delayed such a decision. Prior to the Department of Justice filing its answer to the complaint, the Assistant United States Attorney assigned to the case forwarded to undersigned counsel an August 14, 2017, letter denying the appeal that had been filed almost three years earlier. *See* Exhibit E. The letter contained no detailed reasoning or analysis whatsoever.

### Dr. Isaacs' Federal Loan Discharge Application And Appeal

42. On March 19, 2015, Dr. Isaacs submitted a Loan Discharge Application based on false certification due to disqualifying status. *See* Exhibit F. The application stated that as a medical student at the American University of the Caribbean, Dr. Isaacs' loans were falsely certified because of two independent issues that disqualified him from obtaining a license to practice medicine.

43. The first issue was the traumatic brain injury that Dr. Isaacs suffered while he was an undergraduate student at Dartmouth College. Dr. Isaacs explained that his concentration suffered in the immediate aftermath of the injury. He further described the frontal brain impairment diagnosed in 2012 that at least one doctor tied to the 1997 head injury. Dr. Isaacs stated that he could not complete his postgraduate training requirements due to the concentration problem first arising in 1997, and noted that a Federal court had found that he had a disability but his residency program owed him no further accommodation when he was terminated.[1]

44. The second issue upon which Dr. Isaacs based his application for discharge involved his dismissal from Keck in 2005. While in medical school at the American University, Dr. Isaacs believed that the Keck matter had been sealed and his attendance at Keck annulled by the settlement of Federal litigation relating to the matter. For the same reason, Dr. Isaacs did not include the matter in his residency application. The New Hampshire Board of Medicine, however, determined that non-disclosure of the Keck enrollment on his residency application made him ineligible to maintain his medical license.

---

[1] Indeed, Dr. Isaacs believes that the mistreatment undergone at Dartmouth and the subsequent years of fighting false allegations has worsened his health and warrant an investigation.

45.  MOHELA, the student loan servicer for Dr. Isaacs' loans, issued a notice on June 3, 2015, informing Dr. Isaacs that DOE "was unable to approve your discharge request . . ." *See* Exhibit G. The notice contained no reasoning for the decision.

46.  Dr. Isaacs submitted an appeal of the denial to DOE on June 22, 2015. *See* Exhibit H. In the appeal letter, Dr. Isaacs asked that the DOE address whether the Keck expulsion and/or the frontal brain disability precluded him from completing three years of residence and meeting Pennsylvania's good character requirement. In doing so, he explained that had he not obtained the annulment of his Keck record in the litigation settlement, he believed that he would have been unemployable as a physician. Regarding the brain injury, Dr. Isaacs noted that a Judge in Federal court litigation had held that Dr. Isaacs had suffered a brain injury that affected his performance and led to his termination from his residency program. Given that the head injury had occurred before loan origination, Dr. Isaacs claimed that the injury precluded his employment in his chosen field.

47.  Buttressing his appeal argument, Dr. Isaacs reported that he had applied to nearly every hospital in the country for residency training. Every such program denied his enrollment.

48.  DOE denied Dr. Isaacs' appeal by letter dated March 16, 2016. Regarding the mental impairment, the letter stated that Dr. Isaacs had not shown that the mental condition was a legal bar to his employment. The letter further asserted that if Dr. Isaacs had presented the Keck situation carefully to employer, he might have been hired anyway following an explanation. The appeal denied letter concluded that "licensure may have been difficult, but not impossible to obtain." *See* Exhibit I.

## COUNT ONE

### OCR's Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

49. Plaintiff re-alleges and incorporates Paragraphs 1 through 48 as set forth above

50. The Administrative Procedure Act ("APA") gives courts the power to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

51. OCR's decision to deny Dr. Isaacs' appeal was arbitrary and capricious. It relied on nothing more than a conclusory statement that "careful consideration" occurred. The subjects of this "careful consideration" are not explained, nor is there any explanation of the decision-making process. *See Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("In reviewing [the agency's] explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.").

52. Moreover, OCR's decision is inconsistent with the same parent agency's denial of Dr. Isaacs' loan discharge application. If Dartmouth's actions in harassing and then terminating Dr. Isaacs do not warrant an investigation, then the agency must accept that Dr. Isaacs is unemployable as a resident because of the circumstances that occurred at Keck and/or his longstanding head injury. If Dr. Isaacs is unemployable in the field he has chosen, then the discharge application should have been granted.

53. OCR's denial of Dr. Isaacs' appeal constitutes an arbitrary and capricious agency action, violative of Section 706(2) of the APA.

## COUNT TWO

**Violation of Administrative Procedure Act, 5 U.S.C. 706(2)(A), DOE Office of Federal Aid**

54. Plaintiff re-alleges and incorporates Paragraphs 1 through 53 as set forth above

55. The Office of Federal Student Aid's decision to deny Dr. Isaacs' appeal was arbitrary and capricious. The decision letter explains that under different circumstances of disclosure, despite the litigation settlement's bar on doing so, medical licensure would have been "difficult" for Dr. Isaacs, but not "impossible." Beyond parsing words, the decision ignores the fact that Dr. Isaacs' disclosure of the Keck matter would have violated a court-approved settlement.

56. The decision also is inconsistent with the denial of Dr. Isaacs' request that OCR investigate the circumstances of his residency at Dartmouth. If Dartmouth's actions in harassing and then terminating Dr. Isaacs do not warrant an investigation, then the agency must accept that Dr. Isaacs is unemployable as a resident because of the circumstances that occurred at Keck and/or his head injury. Upon information and belief, those were the motivations for Dr. Isaacs' superiors' treatment of him during his short-lived residency.

57. OCR's denial of Dr. Isaaacs' appeal constitutes an arbitrary and capricious agency action, violative of Section 706(2) of the APA.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Dr. Isaacs respectfully requests that the Court grant the following relief:

1. Enter judgment in favor of Dr. Isaacs and against Defendant United States Department of Education;

2. Declare that Defendant is in violation of Section 706(2)(A) of the APA as a result of the arbitrary and capricious decision(s) of OCR and/or the Office of Federal Student Aid;

3. Order Defendant to issue decisions on Dr. Isaacs' appeals that are supported by the law and the facts;

4. Award Dr. Isaacs his attorney's fees and costs in this action pursuant to 28 U.S.C. § 2412; and

5. Award such other legal, equitable, and declaratory relief as the Court deems just and proper.

Respectfully submitted,

Jeffrey Isaacs, M.D.

By his attorney,

Dated: November 7, 2017

/s/ Mark L. Josephs
Mark L. Josephs
Bar No. 568454
Law Office of Mark Josephs, LLC
10 Derne Street
Boston, MA  02114
(857) 250-4998
mark.josephs@markljosephslaw.com