UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
JEFFREY ISAACS,                                     )
                                                    )
              Plaintiff,                            )         Civil Action No.
                                                    )         17-11221-FDS
       v.                                           )
                                                    )
UNITED STATES DEPARTMENT                             )
OF EDUCATION,                                        )
                                                    )
              Defendant.                            )
_____)

MEMORANDUM AND ORDER
ON MOTION TO AFFIRM AND MOTION TO REVERSE AGENCY DECISION

SAYLOR, J.

       This matter arises out of a long-standing dispute between a former medical resident and a

medical school.  Plaintiff Jeffrey Isaacs has brought suit against the Department of Education

("DOE"), alleging, among other things, that a decision by the Office of Federal Student Aid

("FSA") to deny his appeal to discharge more than $200,000 in student loan debt was an

"arbitrary and capricious" agency action in violation of the Administrative Procedure Act

("APA"), 5 U.S.C. § 706(2)(A).

       Isaacs has moved to reverse the agency's decision to deny his applications for false

certification (disqualifying status) loan discharges.  Defendant has opposed that motion, and

moved to affirm.  For the reasons stated below, the Court finds that the agency's decision was

not arbitrary and capricious.  The motion to reverse will therefore be denied and the motion to

affirm will be granted.

## I.      Background

### A.      Factual Background

The allegations in the amended complaint and public record are set out in the Court's Memorandum and Order dated March 12, 2018. Familiarity with that opinion is assumed. The factual background relevant to the motions to reverse and affirm is set forth below.

#### 1.      Isaacs's Educational and Professional History

Dr. Jeffrey Isaacs is a resident of Pennsylvania. (Am. Compl. ¶ 14). In 1997, while he was an undergraduate at Dartmouth College, he suffered a head injury because of an incident with an intoxicated student. (*Id.* ¶ 18). According to Isaacs, the head injury caused long-lasting effects, including "post-concussion syndrome," and hindered his ability to finish his pre-med course requirements. (*Id.*). He dropped several difficult classes and ultimately obtained a degree in computer science. (*Id.*). He went on to attend the Wharton School at the University of Pennsylvania and received a Masters in Business Administration there. (*Id.* ¶¶ 14, 19). By 2005, he had completed the pre-med course requirements that he did not finish at Dartmouth. (*Id.* ¶ 19).

In 2005, Isaacs enrolled at the Keck School of Medicine at the University of Southern California. (*Id.* ¶ 20). However, during his first year, there was an allegation of unprofessionalism brought by one of his classmates. (*Id.*).[1] Keck suspended him in February 2006, and ultimately expelled him. *See In re: Jeffrey D. Isaacs, M.D.*, N.H. Bd. of Med., Docket No. 13-07, (Mar. 11, 2014) (AR 22-30). He subsequently sued Keck.

Ultimately, Isaacs and Heck reached two settlements. (Am. Compl. ¶ 21; AR 380-99). The first settlement, which was agreed to in September 2007, provided that "USC will not

---

[1] Isaacs was accused of harassment. *See Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *2 (D.N.H. Apr. 18, 2014).

release or disclose Isaacs' disciplinary records to any third party, including but not limited to other educational institutions and/or potential employers, unless it receives written consent from Isaacs or a subpoena or court order." (Am. Compl. ¶ 21; AR 32, 380-81). The second settlement, which was entered into in 2008, "discharge[d] all contracts and agreements" relating to his time at Keck. (Am. Compl. ¶ 21). The settlement agreements included a confidentiality provision providing in part, in the following or similar language, that "Isaacs agrees not to disclose the negotiation, terms, or conditions of this Agreement . . . [unless] required by law . . . ." (AR 34, 384-85, 395). That provision further provided, in the following or similar language, that "[i]f Isaacs is asked about his claims against [Keck], and only if asked, he may state only that 'the matter has been resolved.'" (AR 34, 385, 396).

Isaacs then enrolled in the American University of the Caribbean Medical School ("AUCMS"). (*Id.* ¶ 22). He received a degree from that institution in 2010. (*Id.*). Between the loans he obtained for Keck and AUCMS, he received more than $200,000 in federal student aid to pay for his medical school tuition. (*Id.*). He took the United States Medical Licensing Examination, and his score "exceeded that of the average neurosurgeon, his desired specialty." (*Id.*; *see also* AR 241-46 (Licensing Examination Score Report)).

After graduating, Isaacs began a surgical program residency at the University of Arizona. (*Id.* ¶ 23). By his third day, supervisors described him as "far behind his peers" and lacking "technical ability." (*Id.*). He resigned from the residency after approximately six weeks. (*Id.*).

Isaacs then obtained a psychiatric residency position at Dartmouth-Hitchcock Medical Center in New Hampshire in 2011. (*Id.* ¶ 24). In his application, he "omitted both his attendance at [Keck] and his aborted residency at [the University of Arizona]." *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *2 (D.N.H. Apr. 18, 2014) (granting

3

summary judgment to defendants).[2]

Relatively early in his tenure at Dartmouth-Hitchcock, Isaacs was placed on probation. (Am. Compl. ¶ 26).  He alleges that "the stress of being placed on probation," coupled with "criticism from superiors," led to "the development of significant health problems," including a sleep disorder.  (*Id.* ¶¶ 26-27).  The complaint further alleges that the sleep disorder also stemmed from his 1997 head injury.  (*Id.* ¶ 29).

In January 2012, a supervisor at Dartmouth-Hitchcock discovered that Isaacs had previously been a resident at the University of Arizona.  (*Id.* ¶ 30).  On March 19, 2012, Dartmouth-Hitchcock issued a letter to Isaacs stating that he was being terminated for his failure to disclose his record at Keck and his Arizona residency.  (*Id.* ¶ 31).[3]  Isaacs acknowledges that he never disclosed his record at Keck to Dartmouth-Hitchcock, but contends that he did so because he believed his prior litigation sealed all documents relating to his attendance there.  (*Id.* ¶ 44).

The New Hampshire Board of Medicine subsequently revoked Isaacs's medical license. It also found that his termination from Dartmouth-Hitchcock was appropriate because he concealed material information in his residency application.  *See In re: Jeffrey D. Isaacs, M.D.*, at 8-9 (AR 29-30).  The Board of Medicine further reprimanded him for not only failing to provide any "credible evidence" in support of his position, but also knowingly making a false statement and failing to disclose a material fact.  *Id.*

---

[2] The complaint in this case alleges that Isaacs had disclosed his prior residency before joining Dartmouth-Hitchcock.  (Am. Compl. ¶¶ 24, 30).

[3] In Count 1, Isaacs alleged that the refusal of DOE's Office of Civil Rights to investigate the circumstances of his residency and termination was arbitrary and capricious.  Those circumstances are more fully detailed in the Court's March 12, 2018 Memorandum and Order dismissing Count 1 on the basis of sovereign immunity and for failure to state a claim.

2.    <u>**The Loan Discharge Applications**</u>

In March 2015, Isaacs submitted two applications to the FSA to discharge his Keck and

AUCMS loans.  (Am. Compl. ¶¶ 7, 42-44; AR 1-4, 37-40).  Specifically, he sought loan

discharges on the basis of false certification due to disqualifying status.  (AR 1-4, 37-40).  The

relevant regulation, 34 C.F.R. § 685.215, provides for loan discharges for student borrowers

who, among other things, "because of a physical or mental condition, age, criminal record, or

other reason accepted by the Secretary, would not meet the requirements for employment (in the

student's State of residence when the loan was originated) in the occupation for which the

training program supported by the loan was intended."  The application form that Isaacs

submitted advised that "[t]o qualify for a loan discharge based on false certification due to a

disqualifying status you . . . must have been unable—at the time the school originated or certified

your loan—to meet the legal requirements for employment in your state of residence . . . in the

occupation for which the program of study was intended."  (AR 1, 37).

Isaacs's applications asserted two bases for discharge on the basis of false certification

due to disqualifying status:  (1) his "mental condition" arising from the lasting effects of his 1997

head injury and (2) his "criminal record" stemming from his expulsion from Keck.  (Am. Compl.

¶ 7; AR 1, 37).[4]  The complaint alleges that his mental condition predated both loans, and that

both events "potentially rendered him unable to meet the legal requirements for employment as a

physician."  (Am. Compl. ¶ 7).  Specifically, he contends that his brain injury prevented him

---

[4] While Isaacs's mental condition was included as a basis for discharge in both applications, his Keck expulsion was, for obvious reasons, only included as a basis for discharge in the AUCMS application.  (*See* AR 1-4, 37-40).

Isaacs takes issue with DOE and the Board of Medicine's "mischaracterization" of his Keck expulsion as a "criminal record," because the incident did not result in criminal charges.  He contends he has no criminal record of any kind.  (*See, e.g.*, Mot. to Reverse at 2).  However, Isaacs himself checked the "criminal record" box on his AUCMS loan discharge application, despite the availability of an "other (specify)" box.  (*See* AR 37).

from completing a residency program, and that his expulsion from Keck prevented him from being able to demonstrate "good moral character," both of which are required for medical licensure in most, if not all, states.  (AR 325).

In his loan-discharge applications, Isaacs was asked to cite to a "specific state law or regulation" that provided "requirements for employment that [he] . . . could not meet."  He cited "State Medical Board Licensure Requirements," and attached a copy of N.H. Rev. Stat. § 329.12, "Qualifications of Licensees."  (AR 1, 20, 37, 55).  That statute requires, among other things, that applicants for licensure as physicians and surgeons in New Hampshire demonstrate that they have completed at least two years of postgraduate training, more commonly known as residency. *See* N.H. Rev. Stat. § 329.12.[5]  It further requires applicants to demonstrate that they are of "good professional character."  *See id.*[6]

In an attached narrative explanation, Isaacs stated that the New Hampshire statute was merely an example, and that he was "no longer eligible for licensure as a doctor in any state in America [because] [a]ll 50 states require a doctor to pass two years of postgraduate training ('medical residency') before obtaining a license to practice medicine."  (AR 7, 41).  With respect to the residency requirement, he stated that he was unable complete a residency due to "medical difficulties" dating back to his 1997 head injury.  (*Id.*).  He attached two reports from doctors purportedly documenting those medical difficulties.  (AR 7-19, 41-54).  He further stated that his disability had been "extensively litigated," and that the United States District Court for the District of New Hampshire had found that he had a disability, but that his residency program was

---

[5] In his appeal, evidently because he resided in Pennsylvania at the time he obtained the loans, Isaacs cited the Pennsylvania statutory equivalent, which requires three years of residency if the applicant is a graduate of an accredited medical school.  (*See* AR 325, citing 49 Pa. Code § 17.1(a)(4)(iii)).

[6] Again, Isaacs cited the Pennsylvania statutory equivalent in his appeal, which similarly requires applicants to demonstrate that they are of "good moral character."  (*See* AR 325, citing 49 Pa. Code §§ 16.12(2), 17.1(a)(5)).

not obligated to accommodate that disability, "and therefore [he] was terminated [by Dartmouth-Hitchcock], barring [him] from licensure." (AR 7, 41). Finally, he stated that he had been receiving long-term SSDI disability payments since 2012. (*Id.*).

With respect to his expulsion from Keck, Isaacs stated that this event would "disqualify [him] from medical licensure" because all 50 states require a showing of "good character." (AR 42). He stated that he would not be able to satisfy such a requirement because the Board of Medicine, which was then "upheld" by the New Hampshire Supreme Court, "determined . . . that [he was] ineligible for licensure as a physician for alleged stalking conduct that occurred . . . prior to [his] enrollment at AUC." (*Id.*). He further stated that the dismissal itself, apparently for "stalking," involved a faculty vote that he "did not possess the 'essential characteristics of a physician,'" which would also "disqualify [him] from medical licensure." (*Id.*). He also explained his (apparently mistaken) belief that the Keck settlement agreements sealed his disciplinary records and "annulled" the expulsion matter, thereby relieving him from the obligation of disclosing his Keck attendance, and stated that he had attached the settlement agreements as documentation. (*Id.*).

In a letter dated June 3, 2015, the Higher Education Loan Authority for the State of Missouri ("MOHELA"), the loan servicer for DOE, informed Isaacs that the agency had denied his discharge requests. (Am. Compl. ¶¶ 8, 17; AR 321-23). The MOHELA letter informed him that his loans were not eligible for discharge because "[t]he evidence does not show the mental condition was a bar to employment. License was revoked for making a false statement and failure to disclose on the license application." (AR 321).[7]

Isaacs appealed the denial on June 22, 2015. (Am. Compl. ¶¶ 9, 46; AR 324-458). He

---

[7] The complaint alleges that the MOHELA denial letter "contained no substantive assessment of [his] application nor any factual or legal analysis whatsoever." (Am. Compl. ¶¶ 8, 45).

used his appeal letter to provide further explanation "regarding the reasons for his mental condition and the allegations rendering him unable to obtain a medical license," including the fact that he had applied to "nearly every hospital in the country for residency training" without success.  (Am. Compl. ¶¶ 9, 46-47; AR 324-330).  Among other things, he contended that the agency, in the course of reviewing his appeal, (1) "must determine the legal ramifications of a Sealed and Discharged Expulsion from USC Medical School; and (2) "Must Investigate the Cause of Isaacs' Frontal Brain Disability."  (AR 325, 327).

The agency denied his appeal and upheld the denial on March 16, 2016.  (Am. Compl. ¶¶ 10, 48; AR 467-69).  The three-page denial letter framed the "rules/requirements" of the appeal issue as follows:

> The sole purpose for this type of discharge (false certification-disqualifying status) is to provide relief to those student borrowers who had a known physical, mental, or legal status or condition at the time of enrollment that would have prevented the student from satisfying the requirements for employment in his or her field of study.  However, it is the responsibility of the applicant to provide evidence that, at the time of enrollment, a status existed that, by reason of a State regulation, barred his or her employment in the field of study.  The conditions are as follows:
>
> > (1) Documentation demonstrating a status or condition based on a physical or mental condition, age, or criminal record that would bar employment in the field of study;
> >
> > (2) A copy of a State statute or regulation that provided that the condition or status would prevent satisfaction of the requirements of the State in which the student resided for performance of the occupation for which the program of instruction was designed to prepare the student; and
> >
> > (3) Evidence that the condition or status in question existed at the time of enrollment.

(AR 467).

The DOE letter then informed Isaacs that "[a]fter a thorough review of [his] request and information by all parties involved, the U.S. Department of Education upholds the previous

decision to deny [his] request for discharge for the following reasons:"

> Your documentation does not conclusively show that you were legally barred from getting a medical license at the time that you enrolled in both schools.  You have not shown that your mental condition is a legal bar to your employment, only that it can make things difficult, but not impossible.  You have also not shown that your criminal record is a legal bar, because the medical license that you did receive in 2011 (resident training license) was revoked in 2014 on the basis of false statements and a failure to disclose on your part, not based on the criminal record itself.  The medical board documentation suggests that if you had presented the USC situation as they determined you should have presented it, you would have been allowed the opportunity to present an explanation of the situation, and may or may not have been denied licensure.  Therefore, the evidence does not show that you were barred at the time you enrolled in the schools, only that licensure may have been difficult, but not impossible to obtain.  Unfortunately your situation does not meet the standard for discharge for disqualifying status.

(AR 468).

The denial letter then stated that in light of his receipt of disability benefits, he "may want to inquire with [his] loan servicer about applying for a disability discharge."  (*Id.*).[8]

### B.    Procedural Background

Isaacs filed suit against the Department of Education on June 30, 2017.  He filed an amended complaint on November 7, 2017, asserting two claims against defendant for violations of the APA:  one by OCR (Count 1) and one by FSA (Count 2).

The complaint alleges that the DOE's denial of his appeal was arbitrary and capricious and "not supported by the facts that DOE relied upon."  (Am. Compl. ¶¶ 11, 55, 57).  It further alleges that the decision was inconsistent with OCR's denial of his request to investigate the circumstances of his residency at Dartmouth because "[e]ither there was a problem with Dartmouth's and the New Hampshire Medical Board's actions . . . or both entities acted properly, demonstrating it was indeed legally and otherwise impossible for Dr. Isaacs to obtain a

---

[8] Apparently Isaacs never pursued that option.

license." (*Id.*).

Defendant moved to dismiss Count 1, a claim against OCR for failing to investigate the circumstances surrounding his termination from Dartmouth-Hitchcock, on the basis of sovereign immunity and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  The Court granted that motion on March 12, 2018.

The parties have now filed cross-motions to reverse and affirm the agency's decision on Count 2, the sole remaining claim, arising from the denial of Isaacs's appeal of his rejected loan discharge applications.

## II.   <u>Standard of Review</u>

Judicial review under The Administrative Procedure Act is "narrow" because the court "affords great deference to agency decision-making."  *International Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015) (quoting *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)).  An agency's decision is "presumed to be valid" if it is "supported by a rational basis."  *Puerto Rico Tel. Co. v. Telecommunications Regulatory Bd. of Puerto Rico*, 665 F.3d 309, 319 (1st Cir. 2011).  "Even if an inquiring court disagrees with the agency's conclusions, it 'cannot substitute its judgment for that of the agency.'"  *Boston Redevelopment Auth. v. National Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Associated Fisheries*, 127 F.3d at 109).  A court may only "hold unlawful and set aside agency action, findings, and conclusions found to be . . .arbitrary, capricious, an abuse of discretion," or otherwise contrary to law.  5 U.S.C. § 706(2)(A)-(D); *Associated Fisheries*, 127 F.3d at 109.

In determining whether agency action is arbitrary and capricious under the APA, the court must examine the evidence relied on by the agency and the reasons given for its decision. The agency is required to "examine the relevant data and articulate a satisfactory explanation for

its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 351-52 (1st Cir. 2004). "An agency action is arbitrary and capricious when the agency 'relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Boston Redevelopment Auth.*, 838 F.3d at 47 (quoting *Associated Fisheries*, 127 F.3d at 109).

A court reviewing agency action must judge that action by the reasons given by the agency; it is not permitted to supply its own reasoned basis not present in the administrative record. *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) ("[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given . . . ." (citing *Securities & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947))); *Securities & Exch. Comm'n v. Chenery*, 318 U.S. 80, 87-88 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Furthermore, the agency's action may only be judged against the information available to the agency at the time—namely, the materials in the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The reviewing court may, however "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Bowman Transp.*, 419 U.S. at 286; *see Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

**III.   Analysis**

While Isaacs makes a number of objections to DOE's denial letter, he asserts two primary

reasons for concluding that the agency's decision arbitrary and capricious.  First, as to his expulsion from Keck, he contends the agency ignored relevant evidence—specifically, the effect of his two settlement agreements with Keck.  Second, as to the long-term effects of his 1997 head injury, he again contends the agency ignored relevant evidence, including medical assessments and his receipt of long-term disability benefits.  He further contends that the agency failed to adequately explain the basis for its conclusion that his head injury was not a legal bar to medical licensure.

Defendant contends that the agency's decision had a rational basis and was not arbitrary or capricious.  Specifically, it contends the agency properly affirmed the denial of the loan discharge application because Isaacs did not show that he was legally barred from obtaining a medical license at the time he attended each medical school.[9]

As explained more fully below, the Court concludes that the agency's denial letter, although perhaps sparse, adequately explained what Isaacs was required to show to obtain a discharge based on a false certification due to disqualifying status, and how he failed to make that showing.

The agency first explained that Issacs needed to "provide evidence that, at the time of enrollment, a [known] status existed that, by reason of a State regulation, barred his or her employment in the field of study."  (AR 467).  Specifically, he needed to provide "(1) Documentation demonstrating a status or condition based on a physical or mental condition, age, or criminal record that would bar employment in the field of study; (2) A copy of a State statute

---

[9] The Court notes, at the outset, that while defendant offers a number of apparently meritorious reasons why the loan discharge applications were properly rejected—including the absence of medical documentation of a brain injury with long-lasting effects, and the absence of evidence that either medical school was aware of such a brain injury—the Court is bound by the actual reasons given by the agency in its denial letter, and cannot consider any additional reasons not provided in that denial.  *See Bowman Transp*, 419 U.S. at 285-86.  Even given those constraints, however, the Court finds the agency's explanation of its decision, albeit succinct, sufficient to ascertain a rational basis.

or regulation that provided that the condition or status would prevent satisfaction of the

requirements of the State . . . for performance of the occupation . . . ; and (3) Evidence that the

condition or status in question existed at the time of enrollment."  (AR 467).

"After a thorough review of [Isaacs's] request and information by all parties involved,"

the agency concluded that he failed to make the required showing, and therefore upheld

MOHELA's denial.  (AR 468).  Specifically, the agency found that his documentation did not

"conclusively show that [he was] legally barred from getting a medical license at the time that

[he] enrolled in both schools."  (*Id.*).

### A.     DOE's Findings Regarding Isaacs's Keck Expulsion

With respect to the Keck expulsion, the agency found that Isaacs had not "shown that

[his] criminal record is a legal bar, because the medical license that [he] did receive in 2011

(resident training license) was revoked in 2014 on the basis of false statements and a failure to

disclose . . . , not based on the criminal record itself."  (*Id.*).  The agency noted that it specifically

considered "medical board documentation" that "suggests that if [Isaacs] had presented the USC

situation as they determined [he] should have presented it, [he] would have been allowed the

opportunity to present an explanation of the situation, and may or may not have been denied

licensure."  (*Id.*).  The agency's statement that it considered "medical board documentation" can

be easily understood to refer to the Final Decision and Order issued by the New Hampshire

Board of Medicine in its adjudicatory/disciplinary proceeding.  *See In re: Jeffrey D. Isaacs,*

*M.D.*, at 8-9  (AR 22-30).  In that proceeding, the Board of Medicine reviewed, among other

things, the language of the Keck settlement agreements, and made a number of specific findings,

including:

- "[T]hat Dr. Isaacs [was] terminated from the [Dartmouth-Hitchcock]
  Program [because he] allegedly omitted material facts from his

Application for Training License for Residents . . . .”

- “*A review of . . . [the Keck settlement agreement] indicates that it is only the information related to the lawsuit, and the negotiation of the Settlement Agreement's terms and conditions that is confidential*, along with the monetary settlement amount.  There is no provision in [the settlement agreement] 'sealing the disciplinary records.'”

- “The question on the application did not require [Isaacs] to divulge information regarding the Confidential Settlement Agreement.  The answer in the license application was, however, required to be correct.  *[Isaacs] could have chosen to say 'Yes' which would have likely given him an opportunity to explain*; or he could have indicated that he contends he was wrongfully dismissed.”

- “We find this Agreement does not insulate [Isaacs] from having to affirmatively disclose his attendance.  As such, where we also find the evidence submitted supports the conclusion that *[Isaacs] knowingly made a false statement and further failed to disclose a material fact*, the license of Dr. Isaacs is REVOKED and he is REPRIMANDED.”

(AR 22, 27-30) (emphasis added).

The Court can “reasonably discern” from the record that the agency did not ignore relevant evidence or fail to consider key issues concerning Keck expulsion.  It is clear from the agency's denial letter that, at the very least, it specifically considered the Board of Medicine's findings surrounding the basis for revoking his license and the effect of the Keck settlement agreements, if not the actual language of the agreements, found elsewhere in the record.  (*See also* AR 32-35, 380-99).  The agency is not required to specifically refer to each document in the record in its determination, or even address every argument the claimant makes.  Rather, it is required to rely on “[]proper factors,” “consider pertinent aspects of the problem,” “examine the relevant data,” and then “articulate a satisfactory explanation for its action.”  *See Boston Redevelopment Auth*, 838 F.3d at 47 (quoting *Associated Fisheries of Maine*, 127 F.3d at 109); *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).  The agency did that here.  It examined the relevant information, considered all relevant aspects

14

of the problem, and reached the very plausible conclusion that Isaacs had not shown that his Keck expulsion was a legal bar to employment at the time of his enrollment at AUCMS.

        **B.**    <u>**DOE's Findings Regarding Isaacs's Head Injury**</u>

        With respect to the long-term effects of his 1997 head injury, the agency stated that Isaacs had "not shown that [his] mental condition is a legal bar to your employment, only that it can make things difficult, but not impossible." (AR 468). Isaacs contends the agency ignored relevant evidence of his disability, including medical assessments and his stated receipt of long-term disability benefits, and that the bases for its ultimate conclusion were not explained.

        Although the agency's articulation of its reasons for denying Isaacs's appeal with respect to his head injury is somewhat bare, the Court can nonetheless "reasonably discern" from the record that the agency did not ignore evidence of his claimed disability. The agency specifically cited the disability benefits Isaacs stated that he receives when it suggested that he "may want to inquire with [his] loan servicer about applying for a disability discharge." (*Id.*). And it can be inferred from the agency's statement that Isaacs had "not shown that [his] mental condition is a legal bar to your employment, only that it can make things difficult, but not impossible," that the agency reviewed the medical records he submitted. (*Id.*). Again, the agency examined the relevant data—evidence of the purported disability—and reached the very plausible conclusion that his head injury was not a legal bar to his employment as a physician. Furthermore, it explained the basis for that conclusion: the evidence only showed that his mental condition could make employment as a physician difficult, but did not show that it would be impossible.

        In conclusion, DOE's denial letter, albeit sparse, articulated a satisfactory explanation for its decision to deny Isaacs's discharge application on both grounds raised in the appeal. The agency's decision that "the evidence does not show that [Isaacs was] barred at the time [he]

15

enrolled in the schools, only that licensure may have been difficult, but not impossible to obtain"
had a rational basis, was supported by the record, and therefore was not arbitrary or capricious.
(*See* AR 468).

## IV.    <u>Conclusion</u>

For the foregoing reasons, Isaacs's motion to reverse the agency's decision is DENIED
and defendant's motion to affirm the agency's decision is GRANTED.

**So Ordered.**


<u>/s/  F. Dennis Saylor</u>
F. Dennis Saylor IV
Dated:  March 8, 2019                          United States District Judge